# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GARY JACOBS, | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | 3:08-cv-868 (CFD) |
| | : | |
| CONNECTICUT COMMUNITY | : | |
| TECHNICAL COLLEGES, | : | |
|     Defendant. | : | |

## RULING ON MOTION FOR SUMMARY JUDGMENT

The plaintiff, Gary Jacobs, brought this action alleging employment discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. His discrimination claims are based on sexual orientation and gender. The defendant, the Board of Trustees of Connecticut Community Technical Colleges, has filed a motion for summary judgment as to all of Jacobs' claims. For the reasons that follow, the defendant's motion is granted.

## I.     Factual Background[1]

Jacobs is a gay male who received a Bachelor of Arts degree in Dental Education from Central Connecticut State University ("Central") in 1983. While attending Central, Jacobs worked as a temporary instructor and lecturer at Tunxis Community Technical College ("Tunxis"). Tunxis is operated by the Defendant Board of Trustees of the Connecticut Community Technical Colleges. Jacobs also worked as a part-time instructor at Tunxis in 1985. Jacobs subsequently obtained full-time employment as a dental hygienist in the private sector.

---

[1] The following facts are taken from the parties' Local Rule 56(a) statements, summary judgment briefs, and other evidence submitted by the parties, including depositions. They are undisputed unless otherwise indicated.

-1-

In 1994, Jacobs moved to Florida and was employed as an instructional administrator for Edison Community College in the school's dental hygiene and dental assisting programs. In 2000, while still in Florida, Jacobs spoke with his former instructor at Tunxis, Mary Bencivengo, regarding possible employment opportunities at Tunxis. Bencivengo was the Chair of the Allied Health Department at Tunxis. Bencivengo subsequently recommended Jacobs to Tunxis's president. Then, on August 25, 2000, Jacobs was offered a temporary full-time position as a lecturer in Tunxis's dental hygiene department. He later became a permanent member of the department.

Initially, Jacobs taught in the Dental Hygiene Program ("DH Program") at Tunxis. The DH Program was a two-year program that prepares students for work as registered dental hygienists. Tunxis also had a Dental Assisting Program ("DA Program"), which was a one-year certificate program. As of 2000, when Jacobs was hired, the DH and DA programs were part of the Allied Health Department. Bencivengo was the Chair of the Allied Health Department and was also the Program Coordinator of the DH Program. Sylvia Seaver was the Program Coordinator of the DA Program.

From 2000 to 2004, several changes to the DA and DH Programs at Tunxis were proposed to help increase both student enrollment and student retention in the struggling DA Program. As a result of these proposals, tension among faculty members heightened. In particular, relations between both Jacobs and Bencivengo and Bencivengo and Seaver became strained. Jacobs states that Bencivengo would verbally attack both him and Seaver and would use intimidating body language. It appears that the animosity between Bencivengo and Jacobs was a result of Jacobs' support for Seaver's proposals about the direction of the DA Program.

Despite the apparent hostility between Jacobs and Bencivengo regarding the DA Program, Jacobs received a favorable classroom evaluation and performance evaluation by Bencivengo in 2001. In addition, on September 6, 2001, Bencivengo emailed Jacobs and offered her support for Jacobs in the additional role of Academic Affairs representative.

In April 2002, Bencivengo met with Tunxis's president to discuss Seaver's handling of the DA Program. Subsequently, the DA and DH programs were separated. The DA Program became part of the Math and Science Department and the DH Program remained in the Allied Health Department under Bencivengo's supervision. At this juncture, Jacobs decided to move from the DH Program to the DA Program, where he would work under the Department Chair, Lori Fuller, and the Program Coordinator, Seaver.

Over the course of the next couple of years, relations between Jacobs and Bencivengo continued to sour. In addition, friction between faculty members of the DH Program and DA Program mounted. There is evidence of, among other things, personal confrontations and disputes of Jacobs' qualifications to teach certain courses. Most of the disputes resulted out of conflict over the direction of the DH and DA programs. Then, in the fall of 2002, Jacobs received only a "satisfactory" performance appraisal from Bencivengo.

Jacobs' name was not included on the original 2003 promotion list at Tunxis. To be eligible for the promotion list, an employee needed three years of service at Tunxis—the parties dispute whether Jacobs had satisfied this requirement by 2003. Nonetheless, Jacobs applied for a waiver of the three-year service requirement and Tunxis's president recommended to the Chancellor that Jacobs' waiver be approved. The Chancellor subsequently granted the waiver

and Jacobs' name appeared on the revised promotion list. Jacobs was thereafter promoted on April 14, 2004. In total, five males, including Jacobs, and two females were promoted in 2004.

In April 2004, Colleen Keyes, the Academic Dean at Tunxis, proposed moving the DA Program back under the Allied Health Department with the DH Program due to the poor performance of the DA Program. Both Jacobs and Seaver strongly opposed the proposal but were unsuccessful; moving the DA Program back to the Allied Health Department led to Jacobs being under Bencivengo's supervision again. Due to this move, Seaver decided to transfer to the Counseling Department at Tunxis to avoid day-to-day interaction with Bencivengo.

During the summer of 2004, Jacobs was nominated and interviewed for the Chair position of the Allied Health Department, but Bencivengo was chosen to remain as the Chair of Allied Health by Tunxis's president.[2] However, due to contract requirements, Bencivengo could no longer be both Chair and Program Coordinator. Rather than replacing Bencivengo with another Program Coordinator for the DH Program, the administration decided that one joint Program Coordinator for both the DA and DH Programs was best. After discussing the joint Program Coordinator position with his union representative, Jacobs decided not to apply for the new position because he felt it would be impossible for him to work closely with Bencivengo.[3] However, Jacobs was promoted to Assistant Professor in 2004.

---

[2] In May 2005, Jacobs nominated himself and interviewed again for the position of Chair of the Allied Health Department; however, in August 2005, the Chair position was eliminated as part of a broad restructuring plan at Tunxis.

[3] Jacobs also claims that the administration's decision to consolidate the two Program Coordinator positions was discriminatory and was intended to prevent him from advancing his profession and limiting his compensation.

In 2004, a dispute arose between Bencivengo and Jacobs pertaining to Jacobs' involvement in a college legislative committee that worked on proposed changes to DA regulations. Bencivengo, who sat on a committee overseeing proposals for the broader practice of dental medicine, disagreed with the substance of the proposals that Jacobs recommended to his committee. Despite Jacobs' assertions to the contrary, Bencivengo told Jacobs that he was acting as a representative of Tunxis and therefore any proposals made to the committee would first have to be reviewed and approved by the faculty board at Tunxis. Jacobs alleges that this action was one of several attempts by Bencivengo to limit his professional growth.[4]

In March 2007, Tunxis hired Erin Annecharico as a full-time Educational Assistant ("EA") in Tunxis's Workforce Development/Continuing Education Division. Annecharico was later reclassified to the position of Continuing Education Coordinator in July 2008. Jacobs had previously contemplated moving to the non-credit DA Program as an EA, but ultimately chose not to. Jacobs, however, believed that Tunxis's decision to hire Annecharico discriminated against him. Nonetheless, Jacobs was granted tenure in April 2007 and promoted to Associate Professor in 2008. He remains at Tunxis in those capacities. Despite these promotions, Jacobs claims that he was discriminated and retaliated against and subjected to a hostile work environment based on his gender and sexual orientation.

---

[4] Jacobs describes several other conflicts with Bencivengo and members of the DH Program faculty from 2004 to 2008. These include a dispute regarding the installation of a printer in his office, scheduling conflicts, availability of professional development days, the proper notification procedures for the taking of sick days, and a dispute involving travel reservations.

## II. Discussion

### A. Summary Judgment Standard

In a summary judgment motion, the burden is on the moving party to establish that there are no genuine disputes of material fact and that it is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Eng'g Corp., 221 F.3d 293, 300 (2d Cir. 2000); Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir. 2000) (citing Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994)). Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38. "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." Carlton, 202 F.3d at 134. Consistent with this standard, all evidence favorable to the nonmoving party must be credited if a reasonable jury could credit it. Evidence favorable to the moving party, on the other hand, must be disregarded unless a reasonable jury would have to credit it because it comes from a disinterested source and is uncontradicted and unimpeached. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51 (2000). "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence

presented, the question must be left to the jury. Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

### B. Sexual Orientation

Jacobs claims that he was discriminated against under Title VII based both on his gender and his sexual orientation. Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). "Title VII does not prohibit harassment or discrimination because of sexual orientation." Simonton v. Runyon, 232 F.3d 33, 35 (2d Cir. 2000). Accordingly, the defendant's motion for summary judgment as to Jacobs' Title VII claim for discrimination and retaliation based on sexual orientation is granted. However, Jacobs also claims that he was discriminated against because he is a male and the Court addresses Jacobs' gender discrimination claim below.

### C. Exhaustion of Administrative Remedies

A plaintiff may bring an employment discrimination action under Title VII for gender discrimination only after filing a timely charge with the federal Equal Employment Opportunity Commission ("EEOC"), or with "a State or local agency with authority to grant or seek relief from such practice." See Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 82–83 (2nd Cir. 2001) (citing 42 U.S.C. § 2000e5(e)). The United States Supreme Court has held that a plaintiff must file a complaint with the EEOC within 300 days of each discriminatory act. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109–15 (2002). Title VII "precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period." Id. at

105. "[D]iscrete acts that fall within the statutory time period do not make timely acts that fall outside the time period." Id. at 112.

Jacobs claims that he does not allege "discrete acts" of discrimination but rather alleges a "continuous pattern of sex discrimination over a period of many years." Therefore, Jacobs argues, his claims should not be subject to the 300-day time bar. The Supreme Court has specifically addressed the issue of when a plaintiff's claims should be subject to the continuing violation doctrine and when they should be considered discrete acts:

> Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice." [A plaintiff] can only file a charge to cover discrete acts that "occurred" within the appropriate time period. . . . Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The "unlawful employment practice" therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. Such claims are based on the cumulative effect of individual acts.

Nat'l R.R., 536 U.S. at 114–15; see also Lunardini v. Mass. Mut. Life Ins. Co., 696 F. Supp. 2d 149, 164–65 (D. Conn. 2010) (describing the scope of the continuing violation exception). Here, Jacobs filed a complaint with the state Commission on Human Rights and Opportunities ("CHRO") on June 25, 2007. Thus, any claims of "discrete acts" that occurred more than 300 days prior to June 25, 2007 (acts occurring before August 30, 2006[5]) are outside the statutory period and not properly before this Court. Specifically, Jacobs' claim that he was discriminated against when he was not promoted to Program Coordinator in August 2004 and to Program Chair

---

[5] The defendant calculates this date as August 25, 2006 in its memorandum; however, based on the Court's calculation, August 30, 2006 is the correct date. This discrepancy is not material to Jacobs' claims.

in May 2005 are time barred.  See Petrosino v. Bell Atl., 385 F.3d 210, 220 (2d Cir. 2004) (finding that the failure to promote is a discrete act not subject to the continuing violation doctrine).  In addition, Jacobs' claim that he was discriminated against when transferred from the DH Program to the DA Program in 2002 and Jacobs' claim that he was given a discriminatory workload from 2000 to 2002 and from 2004 to 2005 are also time barred.

    D.    Disparate Treatment

Title VII claims in which there is no direct evidence of discrimination are analyzed under the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under the McDonnell Douglas standard, to establish a prima facie case of discriminatory conduct based on an adverse job action, a plaintiff must show: (1) that he is a member of a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.  See Feingold, 366 F.3d at 152.  The U.S. Court of Appeals for the Second Circuit has characterized the evidence necessary for the plaintiff to satisfy this initial burden as "minimal" and "de minimis."  See Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005); Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001).  Once a plaintiff has established a prima facie case, the burden of production shifts to the employer to articulate "a legitimate, non-discriminatory reason for" the adverse employment action.  Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).  If the employer is able to do so, "the burden shifts back to the plaintiff to prove that discrimination was the real reason for the employment action."  Id.

The defendant admits that Jacobs satisfies the first two prongs of the McDonnell Douglas test but asserts that Jacobs does not satisfy the third and fourth prongs. The third prong—that the plaintiff suffered an adverse employment action—requires more than a "mere inconvenience or an alteration of job responsibilities." Feingold, 366 F.3d at 152. "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Id. In addition, a discriminatory workload could also constitute an adverse employment action. Id. at 153. Here, many of the adverse employment actions that Jacobs alleges are time-barred as discussed in the foregoing administrative exhaustion analysis. Consequently, the only remaining allegations that could constitute an adverse employment action are Jacobs' claim that he was discriminated against based on his sex when the defendant failed to promote him in 2007[6] and that he was subjected to a discriminatory workload in 2008 and 2009.

Given that Jacobs suffered at least one material adverse employment action, Jacobs must show, pursuant to the fourth prong of the McDonnell Douglas test, circumstances that give rise to an inference of discrimination in the defendant's actions. However, there is no evidence before

---

[6] The defendant claims that Jacobs has mischaracterized his 2007 failure to promote claim. Specifically, the defendant claims that the available position in 2007 was not for Program Coordinator but instead, was for a Continuing Educational Assistant ("EA"). The EA is a non-faculty position, in contrast to the faculty-position of Program Coordinator. If Jacobs had been hired in the EA position, the defendant claims that Jacobs would have lost his tenure track. And, in fact, the evidence shows that after filling the EA position with Annecharico in March 2007, Jacobs was granted tenure just one month later in April 2007. Although the defendant disputes that this constitutes an adverse employment action, the Court must resolve all ambiguities and draw all inferences in favor of Jacobs. Thus, the Court considers Jacobs' failure to promote claim as an adverse employment action.

this Court of actions giving rise to an inference of discrimination. In fact, Jacobs' principal remaining claim, that he was not promoted in 2007, is directly contradicted by the fact that Tunxis offered Jacobs a faculty position in the Business Department in 2007 to help Jacobs maintain his tenure track and awarded him tenure in April 2007. Had Jacobs been promoted to the EA position, he would have lost his faculty status for purposes of attaining tenure. Moreover, Jacobs has not set forth any relevant evidence showing that the failure to promote him to EA was gender-based—the evidentiary record is devoid of any gender-based actions by the defendant.

As to Jacobs' claim that he was subjected to a discriminatory workload in 2008 and 2009, Jacobs has presented no evidence that his schedule was unusually arduous, or that his schedule was established in a discriminatory manner based on his gender. Although Jacobs alleges that he was forced to teach more night classes than his female colleagues and at times was required to teach classes in the morning following an evening course, the undisputed evidence does not support Jacobs' allegations. Jacobs only taught an evening session with an early consecutive morning session in one of fourteen semesters at Tunxis. Meanwhile, at least three female faculty members taught evening courses followed by an early morning course during nine semesters over that same time period. Furthermore, to the extent that Jacobs argues that he was not given the opportunity to teach classes and claims that the administration purposely restructured the DA and DH programs in a discriminatory manner to reduce the number of classes that he was qualified to teach, the undisputed evidence shows otherwise. For example, out of fourteen semesters at Tunxis, Jacobs was afforded the opportunity to and did teach more than the number of credit hours Tunxis was contractually obligated to pay him for, and Jacobs received additional compensation for these extra credit hours taught.

In sum, Jacobs has failed to show that his teaching schedule was materially different from female faculty members and, even further, has failed to produce evidence sufficient to raise an inference of discrimination with respect to any difference that did exist between his teaching schedule and the schedules of his female colleagues. Accordingly, the Court finds that Jacobs has not set forth a prima facie case of disparate treatment and the defendant's motion for summary judgment as to Jacobs' 2007 failure to promote claim and Jacobs' discriminatory workload claim is granted.

### E. Retaliation

Title VII forbids retaliation against an employee for complaining of prohibited employment discrimination. See 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII].") The plaintiff must make out a prima facie case of discrimination by establishing that: (1) he engaged in a protected activity under Title VII; (2) the employer was aware of this activity (3) the employer took adverse action against the plaintiff; and (4) a causal connection exists between the protected activity and the adverse action. See Cifra v. G.E. Co., 252 F.3d 205, 216 (2d Cir. 2001). If the plaintiff makes out a prima facie case, and the "defendant then points to evidence of a legitimate, nonretaliatory reason for the challenged employment decision, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." Id.

Protected activity includes "informal practices of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting

against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990). To show participation in a protected activity, "the plaintiff need only have had a good faith reasonable belief that he was opposing an employment practice made unlawful by Title VII." Kessler v. Westchester Cnty. Dep't of Soc. Servs., 461 F.3d 199, 210 (2d Cir. 2006). However, while an employee does not have to use legal terms when opposing discrimination, see Kelley v. Sun Microsystems, Inc., 520 F. Supp. 2d 388, 403 (D. Conn. 2007), an employee's complaint must be specific enough for the employer to be aware of the plaintiff's opposition to the alleged discriminatory conduct. See id.; Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998). Here, Jacobs prepared a written complaint in both 2002 and 2004 about the alleged discrimination he was subjected to at Tunxis. However, the complaints were never filed with the CHRO. Furthermore, even though Jacobs shared these narratives with a special investigator employed by Tunxis, there is no evidence that any of the faculty or administration at Tunxis were aware of these narratives and the investigator did not reference Jacobs' complaints in her report. Thus, these complaints cannot constitute protected activity.

Jacobs also claims that he made several informal complaints about the ongoing discrimination to the administration at Tunxis. These informal complaints include many emails to various faculty and administrators at Tunxis. The defendant claims that these complaints do not amount to protected activity. While use of the word "discriminatory" in a complaint is not dispositive, see Gibson v. Conn. Judicial Dep't Support Serv. Div., No. 3:05-cv-1396, 2007 WL 1238026, at *9 (D. Conn. Apr. 25, 2007), a rational factfinder could conclude that Jacobs' emails were enough to make Tunxis aware of Jacobs' complaints about discrimination, especially given

against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990). To show participation in a protected activity, "the plaintiff need only have had a good faith reasonable belief that he was opposing an employment practice made unlawful by Title VII." Kessler v. Westchester Cnty. Dep't of Soc. Servs., 461 F.3d 199, 210 (2d Cir. 2006). However, while an employee does not have to use legal terms when opposing discrimination, see Kelley v. Sun Microsystems, Inc., 520 F. Supp. 2d 388, 403 (D. Conn. 2007), an employee's complaint must be specific enough for the employer to be aware of the plaintiff's opposition to the alleged discriminatory conduct. See id.; Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998). Here, Jacobs prepared a written complaint in both 2002 and 2004 about the alleged discrimination he was subjected to at Tunxis. However, the complaints were never filed with the CHRO. Furthermore, even though Jacobs shared these narratives with a special investigator employed by Tunxis, there is no evidence that any of the faculty or administration at Tunxis were aware of these narratives and the investigator did not reference Jacobs' complaints in her report. Thus, these complaints cannot constitute protected activity.

Jacobs also claims that he made several informal complaints about the ongoing discrimination to the administration at Tunxis. These informal complaints include many emails to various faculty and administrators at Tunxis. The defendant claims that these complaints do not amount to protected activity. While use of the word "discriminatory" in a complaint is not dispositive, see Gibson v. Conn. Judicial Dep't Support Serv. Div., No. 3:05-cv-1396, 2007 WL 1238026, at *9 (D. Conn. Apr. 25, 2007), a rational factfinder could conclude that Jacobs' emails were enough to make Tunxis aware of Jacobs' complaints about discrimination, especially given

that the emails contain many passing references about discrimination. Therefore, the Court finds that the emails could constitute "protected activity" under Title VII. In addition to these informal complaints, the parties agree that Jacobs' CHRO complaint, dated June 25, 2007, constitutes a protected activity.

Although Jacobs engaged in protected activity, his retaliation claim fails because he has not produced evidence showing that he suffered a material adverse employment action. To qualify as "materially adverse," such an action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003). Examples of sufficiently material adverse employment actions for retaliation claims include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities . . . ." Id. Jacobs has not shown that he has suffered any of these adverse actions nor any other action that could rise to the level of materiality required. At most, Jacobs' teaching schedule may have been altered and his working relationships with some of the faculty may have soured as a result of his complaints. Meanwhile, Jacobs was repeatedly promoted, including promotions to Assistant Professor and Associate Professor, as well as being awarded tenure. Therefore, the Court finds that Jacobs did not suffer an adverse employment action in retaliation to his complaints of discrimination, and the defendant's motion for summary judgment as to Jacobs' retaliation claim is granted.

  F. <u>Hostile Work Environment</u>

Jacobs also claims that he was subjected to a hostile work environment. In order to prevail on a claim of hostile work environment, the plaintiff must show "(1) that the harassment

was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer." Alfano v. Costello, 294 F.3d 365, 373 (2d Cir.2002) (internal quotations omitted). Hostile work environment claims "are different in kind from discrete acts" and by "their very nature [involve] repeated conduct." Nat'l R.R., 536 U.S. at 115. An actionable hostile work environment is one "permeated with discriminatory intimidation, ridicule, and insult, [and] that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment . . . .' " Harris v. Forklift Sys., Inc., 510 U.S. 17, 21(1993) (internal quotations omitted). Conduct that does not meet the "severe or pervasive" standard is not redressable through Title VII. See id. The Second Circuit has said that "it is axiomatic" that to prevail on a gender discrimination claim based on a hostile work environment, "the plaintiff must establish that abuse was based on her gender." Kaytor v. Electric Boat Corp., 609 F.3d 537, 547 (2d Cir. 2010).

Here, while Jacobs has identified numerous instances of workplace conduct, there is no evidence that any of the conduct was gender-based. Rather, the evidence shows that tension among the faculty and administrators at Tunxis was based on severe disagreements over the future of the DA Program. Furthermore, the animosity among faculty, including Jacobs, was not specifically directed at Jacobs. See Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997) (requiring that the "specific hostility [be] directed toward the plaintiff"). For example, Seaver testified in her deposition that much of Bencivengo's anger was not personally directed at Jacobs. Similarly, Judy Mereschuk, a Clinical Coordinator at Tunxis, described the hostility at Tunxis in her resignation letter without any reference to gender-discrimination. Also, the evidence shows

that following the rising tensions among the faculty at Tunxis, Lee Chiodo, a *female* Clinical Coordinator for the DA Program, requested to move to the Workforce Development/Continuing Education Division in 2004 (at about the same time Jacobs made the request). Thus, the evidence shows that most of the Tunxis faculty perceived the hostility and the hostility was not unique to males, generally, or to Jacobs in particular. Accordingly, the defendant's motion for summary judgment as to Jacobs' hostile work environment claim is granted.

### III. Conclusion

Accordingly, the defendant's motion for summary judgment [Dkt. #56] is GRANTED.

SO ORDERED this 27th day of July 2011, at Hartford, Connecticut.

/s/ Christopher F. Droney
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**